THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK LEE HANCOCK, Defendant-Appellant.

Fourth District   No. 4—01—0678

———

Argued February 14, 2002.—Opinion filed April 23, 2002.

Scott A. Lerner (argued), of Lerner & Kirchner, of Champaign, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Kathy Shepard (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

Respondent, Mark Lee Hancock, appeals the June 14, 2001, jury verdict in the Champaign County circuit court finding him to be a sexually dangerous person pursuant to Illinois's Sexually Dangerous Persons Act (Act) (725 ILCS 205/0.01 through 12 (West 2000)). We affirm.

## I. BACKGROUND

On September 6, 2000, respondent was charged by information in the Champaign County circuit court with the following five felony counts: residential burglary in that respondent entered the dwelling place of another with the intent to commit criminal sexual assault (720 ILCS 5/19—3 (West 2000)), criminal trespass to residence (720 ILCS 5/19—4(a)(2) (West 2000)), aggravated battery in that he kissed a minor in a public way (720 ILCS 5/12—4(b)(8) (West 2000)), aggravated criminal sexual abuse (720 ILCS 5/12—16(a)(6) (West 2000)), and aggravated criminal sexual abuse in that respondent threatened his victim's life (720 ILCS 5/12—16(a)(5) (West 2000)). The grand jury returned a true bill on all counts on September 28, 2000.

On October 19, 2000, the State filed a petition to have respondent declared a sexually dangerous person pursuant to the Act. Respondent subsequently underwent two mandatory court-ordered psychiatric examinations, which were performed by Dr. Lawrence Jeckel and Dr. Arthur Traugott. See 725 ILCS 205/4 (West 2000). On June 11, 2001, the State informed the trial court that it was going to proceed on the petition to have respondent declared a sexually dangerous person and not proceed on the pending criminal charges.

At trial, the two court-ordered psychiatrists testified concerning their evaluations of respondent. The psychiatrists diagnosed respondent as suffering from a number of mental disorders, including pedophilia and voyeurism with a history of exhibitionism. Both agreed that respondent was a sexually dangerous person with a propensity for committing acts of sexual assault against children. One psychiatrist testified that if he did not think respondent would continue committing these crimes in the future, he would not consider him sexually dangerous. The psychiatrists disagreed on whether one could be a pedophile and not be sexually dangerous. One psychiatrist believed that a person who was able to control his urges to molest children was not actually a pedophile, while the other believed that a person could be a pedophile and not be sexually dangerous.

The State introduced the testimony of two police officers, who described interviews they had with respondent. During these interviews, respondent admitted committing the underlying crimes, as well as confessing to a number of other sex-related offenses over a period of several years. Respondent had on occasion broken into a home to look for sex. In one of the incidents that led to these proceedings, respondent was riding his bike at night and broke into a random home because the garage door was not all the way down. Respondent was confronted by an adult male in the house and fled on his bike. Respondent came back, however, and was caught on videotape by the adult male, who was now in his car looking for respondent. Respondent told the homeowner he wanted sex, and he told the police that he came back because he thought the adult male wanted to have sex with him.

Respondent told police that he preferred 9- to 12-year-old girls and that he had on occasion broken into a house, stood over the bed of a sleeping child, and masturbated over the child. Respondent also described taking trips to Springfield, Illinois, and Indianapolis, Indiana, to look for young girls, though he never followed through on whatever it was he was going to do with the children. On one occasion, respondent kissed an 11-year-old girl in public, then ran away. On another occasion, respondent broke into a house, climbed into bed with a 16-year-old girl and stifled her when she started screaming. Re-

spondent fled out the window he had broken into before the girl's parents were able to respond.

Some of these admissions resulted in solving previously reported though unsolved crimes in Champaign County. The actual victims of the incidents to which respondent admitted were identified and testified about the prior assaults at this trial.

The State further introduced into evidence a videotape and audiotape of respondent's interviews with the police officers. Respondent confirmed on cross-examination that he was telling the truth when he made the confessions to the police that were in the recorded interviews.

The State finished presenting its case by informing the jury of respondent's prior convictions in the states of Virginia and Maryland. In 1977, respondent pleaded guilty to assault with intent to rape in Maryland. In 1979, respondent was convicted of unlawful entry in Virginia. In 1984, respondent was convicted of exposure of sexual or genital parts to a child in Virginia. In 1984, respondent was convicted of aggravated sexual battery in Virginia. The trial court instructed the jury that the prior convictions could be considered on the issue of whether respondent had demonstrated propensities toward acts of sexual assault and/or acts of sexual molestation of children.

Respondent testified in his own defense. He claimed that he was successfully controlling his urges through Buddhist meditation and self-administered aversion therapy, the concept of which he learned from a psychiatrist. He was absolutely committed to never masturbating or having sex again. Respondent's mother testified about his change in behavior since he was arrested. A member of respondent's Buddhist group also testified concerning respondent's progress.

The trial court refused respondent's jury instruction, which contained language about requiring the jury to find respondent had a propensity to commit further sex crimes "in the future." The trial court refused an instruction with a definition of "sexual assault" and "penetration." The trial court also refused a jury instruction requiring a specific finding that respondent had a volitional impairment. Finally, the trial court allowed the State to offer a definition of "propensity" during closing rebuttal over respondent's objection. The jury returned a verdict finding respondent to be a·sexually dangerous person. Respondent appeals.

## II. ANALYSIS

Respondent raises eight issues on appeal: (1) the trial court erred in refusing a jury instruction requiring a specific determination that respondent had a volitional impairment; (2) the Act as applied to re-

spondent was unconstitutionally vague; (3) the court erred in refusing respondent's jury instructions defining the terms "propensity," "sexual molestation," and "sexual assault"; (4) the jury erred in finding respondent guilty beyond a reasonable doubt; (5) the court erred in allowing the testimony of one of respondent's victims as well as other evidence related to her case when it was barred by the statute of limitations; (6) the court erred in allowing the State to present evidence that was highly prejudicial yet had no probative value, including reference to masturbation, going to other counties to look at young women, contact with a stripper, and propositioning an adult male for sex; (7) the sentencing provisions of the Act are unconstitutional and violate respondent's right to due process of law and equal protection of the law in violation of the United States Constitution and the Constitution of the State of Illinois (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2); and (8) the court erred in not requiring the State to prove beyond a reasonable doubt any of the underlying offenses that made up the basis for the initial charges. We address each issue in turn.

## A. Does the Constitution Require a Specific Jury Determination that Respondent Suffers From a Volitional Impairment?

While this case was pending on appeal, the United States Supreme Court issued its ruling in *Kansas v. Crane*, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002), on January 22, 2002. Respondent argues that, in *Crane*, the United States Supreme Court has announced a new rule of constitutional law requiring a specific determination by a jury, via a jury instruction, that a respondent lacks volitional control before a respondent may be civilly committed. Therefore, respondent argues, the trial court committed reversible error when it refused his requested jury instruction requiring a specific determination by the jury that respondent lacked volitional control. We have analyzed the United States Supreme Court's holding in *Crane*, and we find that under the facts of this case, the trial court did not err by refusing respondent's requested jury instruction.

Prior to *Crane*, the case that had been the standard for determining the constitutionality of civil commitment proceedings for sexual offenders was *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997). In *Hendricks*, the United States Supreme Court upheld the constitutionality of a Kansas civil commitment statute for sex offenders who suffered from a mental illness. The Kansas statute was very similar to Illinois's Sexually Violent Persons Commitment Act (725 ILCS 207/1 through 99 (West 2000)). The Supreme Court held in *Hendricks* that the Kansas civil commitment statute satisfied

due process because it was of the class of previously upheld civil commitment statutes that limited their application to persons who had a mental illness which made it "difficult, if not impossible," to control their dangerous behavior. *Hendricks*, 521 U.S. at 358, 138 L. Ed. 2d at 513, 117 S. Ct. at 2080. The Supreme Court cited the Illinois Sexually Dangerous Persons Act as a civil commitment statute that had been upheld by the Court because it coupled proof of dangerousness with a mental illness. *Hendricks*, 521 U.S. at 358, 138 L. Ed. 2d at 512-13, 117 S. Ct. at 2080, citing *Allen v. Illinois*, 478 U.S. 364, 366, 92 L. Ed. 2d 296, 302, 106 S. Ct. 2988, 2990-91 (1986).

Following *Hendricks*, the Illinois Supreme Court found that due process does not require a jury to make a specific finding that a sex offender lacks emotional or volitional control over his sexual behavior to support a commitment. See *In re Detention of Varner*, 198 Ill. 2d 78, 759 N.E.2d 560 (2001). *Varner* dealt with the Sexually Violent Persons Commitment Act, which defines "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2000). That definition was sufficient to " 'narrow[ ] the class of persons eligible for confinement to those who are unable to control their dangerousness.' " *Varner*, 198 Ill. 2d at 84, 759 N.E.2d at 563, quoting *Hendricks*, 521 U.S. at 358, 138 L. Ed. 2d at 513, 117 S. Ct. at 2080.

The Kansas Supreme Court took an opposite approach from the Illinois Supreme Court in interpreting its commitment act following *Hendricks*. The Kansas Supreme Court found that "[a] fair reading of the majority opinion in *Hendricks* leads us to the inescapable conclusion that commitment under the Act is unconstitutional absent a finding that the defendant cannot control his dangerous behavior." *In re Care & Treatment of Crane*, 269 Kan. 578, 585-86, 7 P.3d 285, 290 (2000), *vacated sub nom. Kansas v. Crane*, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002).

The United States Supreme Court case of *Kansas v. Crane* was an appeal from the Kansas Supreme Court's decision in the above-mentioned *In re Care & Treatment of Crane*. In the United States Supreme Court, the State of Kansas argued that the ruling in *Hendricks* did not require a specific finding by the jury that a respondent lacks volitional control before he can be civilly committed. The respondent, Crane, argued that there must be a finding of *complete* lack of control. The Court split the difference and held that "[w]e agree with Kansas insofar as it argues that *Hendricks* set forth no requirement of *total* or *complete* lack of control. *** We do not agree with the State, however, insofar as it seeks to claim that the Constitution permits

commitment of the type of dangerous sexual offender considered in *Hendricks* without *any* lack-of-control determination." (Emphasis in original.) *Crane*, 534 U.S. at 411-12, 151 L. Ed. 2d at 861-62, 122 S. Ct. at 870.

■ *Crane* clearly requires *some* determination of *some* lack of control before a respondent can be civilly committed. It is equally clear, however, that *Crane* does *not* require a specific jury determination that a respondent lacks volitional control as respondent suggests, because the Court in *Crane*, again, upheld the commitment in *Hendricks* as constitutional even though there was no specific jury determination of lack of control in *Hendricks*.

The Court in *Crane* explained that *Hendricks* underscored the importance of distinguishing dangerous sexual offenders subject to civil commitment from normal criminals better dealt with through the criminal justice system and stated:

"The presence of what the 'psychiatric profession itself classifie[d] ... as a serious mental disorder' helped to make that distinction in *Hendricks*. And a critical distinguishing feature of that 'serious ... disorder' there consisted of a special and serious lack of ability to control behavior." *Crane*, 534 U.S. at 412-13, 151 L. Ed. 2d at 862, 122 S. Ct. at 870.

The Court recognized that what "lack of control" meant or what level of lack of control was required was not precise but stated that "[i]t is enough to say that there must be proof of serious difficulty in controlling behavior." *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. The Court further explained that "such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862-63, 122 S. Ct. at 870.

Clearly, *Crane* does not stand for the proposition that in every civil commitment case a jury must make a specific determination that the respondent lacks volitional control. Rather, in *Crane* the Court reiterated its holding in *Hendricks* that recognized the "importance of distinguishing a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.' " *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870, quoting *Hendricks*, 521 U.S. at 360, 138 L. Ed. 2d at 514, 117 S. Ct. at 2081.

■ Applying the ruling of *Hendricks* and *Crane* to the facts of this case, we find that the nature of respondent's psychiatric diagnosis,

and the severity of the mental abnormality itself, is sufficient to distinguish respondent from the dangerous but typical recidivist convicted in an ordinary criminal case. Respondent in this case was diagnosed with pedophilia, the same disorder with which the respondent in *Hendricks* was diagnosed. It was this diagnosis of pedophilia which the Court stated provided the distinction between the respondent in *Hendricks* and normal criminals better dealt with through the criminal justice system. *Crane*, 534 U.S. at 412-13, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. Further, the fact that respondent was proved to have repeatedly committed criminal offenses in the pursuit of his uncontrolled sexual urges over the course of at least 25 years is sufficient to satisfy the requirement that the State present "proof of serious difficulty in controlling behavior." *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. Accordingly, we find that the facts of this case distinguish respondent from the "normal criminals better dealt with through the criminal justice system," and we therefore find that the trial court did not commit reversible error when it refused respondent's proffered jury instruction.

### B. The Sexually Dangerous Person's Act as Applied to Respondent Was Not Unconstitutionally Vague

■ The statutory definition of a "sexually dangerous person" is:

"All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children, are hereby declared sexually dangerous persons." 725 ILCS 205/1.01 (West 2000).

Respondent argues that the terms "sexual assault" and "sexual molestation" within the statute are unconstitutionally vague as applied to him. Respondent claims that there was an issue as to whether respondent had sexually assaulted anyone or sexually molested any children because no evidence showed that he had sex with anyone. Therefore, respondent argues, it was necessary for the jury to determine whether the nonpenetration acts he was accused of were in fact acts of "sexual assault" or "sexual molestation" of children.

■ Under the statute, "the State must prove at least one act of or *attempt* at sexual assault or sexual molestation." (Emphasis added.) *People v. Allen*, 107 Ill. 2d 91, 105, 481 N.E.2d 690, 697 (1985), *aff'd*, 478 U.S. 364, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986). Therefore, the State need not prove any penetration or sex occurred; an attempt is enough. The State proved respondent was guilty of assault with intent to rape in Maryland and aggravated sexual battery in Virginia. Con-

trary to respondent's assertion, there was no issue as to whether respondent committed at least one act of or attempt at sexual assault or sexual molestation. This argument is without merit.

## C. The Court Did Not Err in Refusing Respondent's Jury Instructions Defining the Terms "Propensity," "Sexual Molestation," and "Sexual Assault"

■ The instruction the trial court gave to the jury contained the following proposition that the State had to prove beyond a reasonable doubt:

> "Fourth Proposition: That the respondent has demonstrated propensities towards acts of sexual assault or sexual molestation of children."

Respondent argues that the trial court should have given his proposed version of this proposition, which added the language "that will continue into the future" at the end of the sentence. While "the statute is primarily concerned with prediction of the defendant's future conduct" (*Allen*, 107 Ill. 2d at 105, 481 N.E.2d at 697), the statute does not require proof that anything "will" happen in the future. As respondent pointed out at trial, it is impossible to prove what "will" happen in the future. The State need only prove the respondent has demonstrated his propensity to commit acts. Having a propensity to commit acts necessarily implies that the propensity will be acted upon in the future. Respondent's proposed instruction was a misstatement of the law, and therefore, the trial court did not err in refusing it.

■ Respondent also argues that the trial court erred by refusing his proposed jury instruction providing the definition of "propensity" and "sexual molestation." However, the record does not show that respondent ever offered a jury instruction defining "propensity" or "sexual molestation." Respondent cannot assert any error in a lack of an instruction defining propensity or sexual molestation where he did not tender one. *People v. Casillas*, 195 Ill. 2d 461, 480, 749 N.E.2d 864, 877 (2000). This argument is without merit.

■ Respondent next argues that the trial court erred by refusing his proposed jury instruction defining "sexual assault" and "sexual penetration." Respondent bases this argument on his claim that there was some issue as to whether respondent had ever committed a sexual assault. This argument fails because, as we have already held, there was no issue as to whether the State had proved respondent committed at least one act of or attempt at sexual assault or sexual molestation as required by the statute. See *Allen*, 107 Ill. 2d at 105, 481 N.E.2d at 697. This argument is without merit.

■ Respondent further argues that the trial court confused the

definition of "propensity" for the jury by failing to allow respondent to cross-examine the testifying psychiatrist concerning whether respondent would commit sex-related acts in the future. The trial court sustained the State's objection to the following question: "Now, if you knew for a *certainty* [respondent] would never commit a sex[-]related crime, you would not find him sexually dangerous; isn't that true?" (Emphasis added). This question came after respondent's attorney had just asked a series of questions to demonstrate that the psychiatrist could never know "for a certainty" what respondent would do in the future. The record shows respondent's counsel was then allowed to ask the following question: "Dr. Jeckel, if you believed that [respondent] would be *unlikely* to commit a sex related crime in the future, would you find him sexually dangerous?" (Emphasis added.) Dr. Jeckel answered "[n]o." Contrary to respondent's claim, he was allowed to cross-examine the testifying psychiatrist concerning whether respondent would commit sex-related acts in the future. This argument is without merit.

■ Respondent finally argues that the trial court erred when it allowed the State to provide a definition of "propensity" during closing rebuttal argument in a manner inconsistent with its true meaning and without reference to future acts. The complained-of definition given by the State was this: "Propensity is inclination, tendency toward, urge toward doing something." The dictionary defines "propensity" as: "an often intense natural inclination or preference." Merriam-Webster's Collegiate Dictionary 932 (10th ed. 2000). The definition of propensity given by the State is not inconsistent with its true meaning. This argument is without merit.

### D. The Jury Did Not Err in Finding Respondent Sexually Dangerous Beyond a Reasonable Doubt

■ Respondent gives no argument as to why the jury erred in finding him sexually dangerous beyond a reasonable doubt other than to point out that the State's burden of proof is beyond a reasonable doubt and that the concept of beyond a reasonable doubt is hard to define. This argument is forfeited. See Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001; 177 Ill. 2d R. 612(i).

### E. The Testimony of One of Respondent's Victims as Well as Other Evidence Related to Her Case Was Not Barred by the Statute of Limitations

■ Respondent next argues that the trial court erred by allowing the testimony of one of his victims as well as other evidence related to her case because the alleged events occurred in 1996. According to re-

spondent, the statute of limitations somehow barred this evidence. Respondent makes this unsupported claim without citing a statute of limitations that might apply. This argument is forfeited. See Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001; 177 Ill. 2d R. 612(i).

### F. The Court Did Not Err in Allowing the State To Present Evidence, Including Reference to Masturbation, Going to Other Counties to Look at Young Women, Contact with a Stripper, and Propositioning an Adult Male for Sex

■ Respondent argues that evidence of masturbating, homosexual desire, and desires involving an adult stripper are irrelevant to a diagnosis of pedophilia and highly prejudicial. This evidence therefore should have been excluded, because "[i]t is well established that a defendant's prior misconduct is not admissible for the purpose of establishing his bad character or *propensity* to commit illegal or immoral acts, because the prejudicial impact of such evidence outstrips its negligible probative value." (Emphasis added.) *People v. Hendricks*, 137 Ill. 2d 31, 52, 560 N.E.2d 611, 620 (1990). What respondent overlooks is that the entire purpose of this civil proceeding is to determine respondent's *propensity* to commit illegal acts, specifically criminal sexual acts. The masturbation involved breaking into homes and masturbating over children. The homosexual urge involved breaking into a home. The record does not actually indicate which incident involved a stripper, but the only incident in the record involving an adult female involved breaking into a home. These were all related to criminal acts perpetrated in pursuit of respondent's sexual urges. This evidence established respondent's propensity to commit criminal acts in pursuit of his sexual urges and is, therefore, relevant. Further, the Act specifically states:

> "At the hearing on the petition it shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments, if any, were inflicted." 725 ILCS 205/5 (West 2000).

The trial court did not err by allowing the State to introduce evidence of respondent's prior crimes. This argument is without merit.

### G. The Sentencing Provisions of the Sexually Dangerous Person's Act Do Not Violate Respondent's Constitutional Rights to Due Process and Equal Protection Under the Law

■ Respondent argues that the "sentencing provisions" of the Act violate his constitutional right to equal protection under the law because the Act treats some respondents differently than other respondents under the Sexually Violent Persons Act and the Mental

Health and Developmental Disabilities Code (405 ILCS 5/1—100 through 6—107 (West 2000)). Respondents under the Act, the Sexually Violent Persons Act, and the Mental Health and Developmental Disabilities Code are not similarly situated, and therefore, the applications of the acts do not violate the constitutional guarantee to equal protection. See *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1077, 740 N.E.2d 1146, 1150-51 (2000); *In re Detention of Varner*, 315 Ill. App. 3d 626, 634, 734 N.E.2d 226, 233 (2000), *aff'd*, 198 Ill. 2d 78, 759 N.E.2d 560 (2001); *In re Detention of Samuelson*, 189 Ill. 2d 548, 563, 727 N.E.2d 228, 237 (2000).

■ Respondent also argues that the "sentencing provisions" of the Act violate his constitutional right to due process because respondent was sentenced without a presentence report, and the sentencing decision was made by an individual at the Department of Corrections who did not hear the evidence. What respondent again overlooks is that this is a civil proceeding, and respondent is not being "sentenced" to anything. This argument is without merit.

## H. The State Was Not Required To Prove Any of the Underlying Offenses That Made Up the Basis for the Initial Charges

■ The Act states that a petition to declare a person criminally dangerous may be filed "[w]hen any person is charged with a criminal offense and it shall appear to the Attorney General or to the State's Attorney *** that such person is a sexually dangerous person." 725 ILCS 205/3 (West 2000). Respondent argues that, because a petition to have a person declared sexually dangerous can only be filed when that person has an underlying pending criminal charge, it only makes sense that the underlying pending criminal charge must be proved beyond a reasonable doubt. We disagree.

The Illinois Supreme Court has found that declaring a person sexually dangerous under the Act requires proving three elements:

" '(1) the existence of a mental disorder for more than one year; (2) the existence of criminal propensities to the commission of sex offenses; and (3) the existence of demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children.'"
*Allen*, 107 Ill. 2d at 105, 481 N.E.2d at 697, quoting *People v. Pembrock*, 62 Ill. 2d 317, 321-22, 342 N.E.2d 28, 30 (1976).

Proving respondent guilty beyond a reasonable doubt of the underlying pending criminal charge is not a required element of the statute. Indeed, the underlying pending criminal charge need not even be sexually related. *People v. Lovett*, 234 Ill. App. 3d 645, 646, 600 N.E.2d 893, 895 (1992). Instead, under the statute, "the State must prove at least one act of or *attempt* at sexual assault or sexual molestation." (Emphasis added.) *Allen*, 107 Ill. 2d at 105, 481 N.E.2d at 697. The act

or attempt can be proved by introducing proof of a prior conviction. The State has satisfied this burden by introducing verified records of respondent's convictions in Virginia and Maryland.

Respondent cites *People v. Dinwiddie*, 306 Ill. App. 3d 294, 715 N.E.2d 647 (1999), *appeal denied*, 185 Ill. 2d 640, 720 N.E.2d 1098 (1999), for the proposition that "[i]n an initial commitment proceeding, the underlying criminal charge is an element in the determination of dangerousness." *Dinwiddie*, 306 Ill. App. 3d at 297, 715 N.E.2d at 650, citing *People v. Galba*, 273 Ill. App. 3d 95, 100, 652 N.E.2d 400, 404 (1995). In *Dinwiddie* and *Galba*, the underlying criminal charge that allowed for the filing of the petition was the only sexually related crime for which the respondents had been accused. The respondents in those cases apparently had no prior convictions for acts or attempted acts of sexual abuse or molestation. Therefore, the underlying criminal charge in those cases was the "at least one act of or attempt at sexual assault or sexual molestation" (*Allen*, 107 Ill. 2d at 105, 481 N.E.2d at 697) that had to be proved. This fact distinguishes *Dinwiddie* and *Galba* because, in this case, the State was able to prove respondent guilty beyond a reasonable doubt of at least one sexually related crime or attempt by introducing his prior convictions without having to prove the underlying pending charges.

## III. CONCLUSION

We affirm the circuit court's judgment declaring respondent to be a sexually dangerous person.

Affirmed.

McCULLOUGH, P.J., and APPLETON, J., concur.